**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
bgreenberg@litedepalma.com
jdepalma@litedepalma.com

*Counsel for Ottawa County, Ohio*
**[additional counsel listed on signature page]**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OTTAWA COUNTY, OHIO, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FRANK A. REICHL, GENERAL CHEMICAL CORPORATION, GENERAL CHEMICAL PERFORMANCE PRODUCTS, LLC; GENTEK, INC.; CHEMTRADE LOGISTICS INCOME FUND; CHEMTRADE LOGISTICS, INC.; CHEMTRADE CHEMICALS CORPORATION; CHEMTRADE CHEMICALS US, LLC; and GEO SPECIALTY CHEMICALS, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff, Ottawa County, Ohio ("Ottawa County" or "Plaintiff"), by and through its undersigned attorneys, complains and alleges as follows. All allegations herein other than those relating directly to Plaintiff are based on information and belief.

**NATURE OF THE ACTION**

1.      This action arises out of a conspiracy to fix prices, rig bids and allocate customers and territories with respect to the sale of aluminum sulfate (referred to herein as "alum") to governmental and privately-contracted water district authorities and to pulp and paper companies in the United States, in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§

1, 3).  The conspiracy began on  January 1, 1997, and continued until at least July 31, 2010 (the

"Class Period"), the Antitrust Division of the United States Department of Justice ("DOJ") has

granted conditional amnesty to Defendant Chemtrade Logistics, Inc., and is conducting a

criminal investigation of anticompetitive conduct with respect to sales of water treatment

chemicals (including alum). That investigation, which is being conducted by the New York field

office of the DOJ and the New Jersey field office of the Federal Bureau of Investigation, has thus

far yielded a criminal information against, and a guilty plea by, Defendant Frank A. Reichl, a

former executive of Defendant General Chemical Corporation for violations of Section 1 of the

Sherman Act.  *United States v. Reichl*, No. 2:15-cr-00554-JLL (D.N.J.) ("*Reichl*").

## JURISDICTION AND VENUE

2.     This action is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and

26), to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for

violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3).  This Court has

original federal question jurisdiction over the Sherman Act claim asserted herein pursuant to 28

U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

3.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act

(15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside,

transact business, are found within, and/or have agents within this District, and a substantial part

of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected

interstate trade and commerce described below has been carried out in this District.

4.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a)

transacted business in this District; (b) sold and/or delivered alum in this District; (c) has

substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing, bid-

rigging and customer and market allocation conspiracy that was directed at, and had the intended

effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PLAINTIFF

5. Plaintiff is a public body of the State of Ohio with its principal office located at 315 Madison Street, Port Clinton, Ohio 43452. Plaintiff purchased alum during the Class Period directly from one or more of the Defendants. Plaintiff was damaged by paying supracompetitive prices as the result of Defendants' illegal conduct.

## DEFENDANTS

6. Defendant Frank A. Reichl ("Reichl") resides in Flanders, New Jersey. Prior to July of 2005, he was the General Manager of Water Chemicals for General Chemical Corporation ("GCC"). From approximately December of 2006 until he left GCC in 2010, Reichl was Vice President of Sales and Marketing for the company. According to the information filed against him, Reichl "oversaw the sale and marketing of water treatment chemicals, including liquid aluminum sulfate, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other sales and marketing employees" of GCC. *Reichl* Dkt. No. 1 at ¶4. On October 27, 2015, Reichl pleaded guilty to a violation of Section 1 of the Sherman Act, as described below. *Reichl* Dkt. No. 5.

7. Defendant General Chemical Corporation ("GCC") was a corporation existing under the laws of Delaware, which had its principal place of business at 90 East Halsey Road, Parsippany, New Jersey. GCC manufactured chemical products, including aluminum sulfate. GCC's current principal place of business is 155 Gordon Baker Road, Suite 300, Toronto, Ontario M2H 3N5. Until April 30, 1999, GCC was owned by the General Chemical Group, Inc. ("GCG"). On that date, its business was spun off into a holding company known as GenTek Inc. On January 23, 2014, Defendant Chemtrade Logistics Income Fund, a Canadian entity, acquired all of the business of General Chemical Holding Company for $859.9 million in cash ("Chemtrade Acquisition").

8.    Defendant General Chemical Performance Products, LLC ("GCPP") was a limited liability company organized under the laws of Delaware and having its principal place of business 90 East Halsey Road, Parsippany, New Jersey.  GCPP was sold as part of the Chemtrade Acquisition.  When reference is made herein to "GCC," it is intended to include GCPP, unless otherwise indicated.

9.    Defendant GenTek, Inc ("GenTek") was a spin-off of GCG with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey.  On April 30, 1999, GCG separated GenTek's manufacturing and performance products businesses (the "GenTek Business") from GCG's soda ash and calcium chloride industrial chemicals business through a spin-off by transferring the GenTek Business to GenTek, and distributing the common stock of GenTek to GCG's shareholders.  Since the spin-off, GenTek functioned as a separate, stand-alone company which operated through its subsidiaries.  Those subsidiaries included GCC and GCPP.

10.    Defendant Chemtrade Logistics Income Fund ("CLIF") is a limited purpose trust established on July 11, 2001 under the laws of the Province of Ontario, Canada.  Its principal place of business is Suite 300, 155 Gordon Baker Road, Toronto, Ontario M2H 3N5.  As noted above, in 2014, CLIF finalized the Chemtrade Acquisition and thereby acquired the assets and liabilities of GCC and its subsidiaries. It thus bears financial responsibility for the pre-acquisition conduct described herein and has acknowledged that it might be sued for such conduct.  CLIF has also indicated that GenTek has agreed to indemnify it, at least in part, as further described below.

11.    Defendant Chemtrade Logistics, Inc. ("CLI") is incorporated under the laws of the province of Ontario and is a subsidiary of CLIF.  Following the acquisition of GCC, CLI introduced a water solutions and specialty chemicals ("WSSC") business segment which manufactures and markets a variety of coagulants used in water treatment including liquid aluminum sulfate which it markets primarily to North American customers, including customers in the United States.  CLI. now operates GCC as Chemtrade Chemicals Corporation and Chemtrade Chemicals US, LLC which are organized under Delaware law and subsidiaries of

4

CLIF.  CLI maintains offices in Charlotte, North Carolina, Overland Park, Kansas and Parsippany, New Jersey.  CLI also maintains numerous manufacturing facilities in the United States.  During the Class Period, Chemtrade, either by itself or through its wholly-owned subsidiaries, manufactured, marketed and/or sold liquid aluminum sulfate in the United States.

12.   Defendant Chemtrade Chemicals Corporation ("CCC") is the new corporate name for GCC after the Chemtrade Acquisition.  Defendants Chemtrade Chemicals US LLC and Chemtrade Solutions LLC are subsidiaries of CCC.  All are wholly-owned operating subsidiaries of CLIF.  When "CCC" is referred to in this Complaint, it is intended to encompass Chemtrade Chemicals US LLC and Chemtrade Solutions LLC, unless otherwise indicated.  CCC manufactures and sells water treatment chemicals, including alum.

13.   Defendant GEO Specialty Chemicals, Inc. ("GEO") is a private corporation having its principal place of business at 340 Mathers Road, Amber PA 19002-3420.  Founded in 1992, GEO manufactures water treatment chemicals, including alum.

## AGENTS

14.   The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

15.   Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the sale of alum in interstate commerce between and among offices of Defendants and their customers located throughout the United States.

16.   Throughout the Class Period, GenTek, GCC and GEO transported substantial amounts of alum in a continuous and uninterrupted flow of interstate commerce throughout the United States, its territories and the District of Columbia.

17.   Throughout the Class Period, GenTek, GCC and GEO's unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce

and had a direct, substantial and reasonably foreseeable effect upon commerce in the United

States.

## FACTUAL AND MARKET ALLEGATIONS

18.   GCC's current website contains the following description of alum:

> [Alum is] a widely-used and versatile industrial chemical, playing an important role in the production of many essentials seen and used every day in the home and industry.
>
> Most of the alum produced today is used in the pulp & paper industry as well as water and wastewater treatment.  It is inexpensive and effective for a broad range of treatment problems because it can function as a coagulant, flocculant, precipitant and emulsion breaker.  As a coagulant and flocculant, alum removes turbidity, total organic carbon (TOC) which can be disinfection byproduct precursors, suspended solids and colloidal color, reduces biochemical oxygen demand (BOD) and clarifies potable, process and wastewater.
>
> Alum is widely used for lake restoration, treatment and nutrient inactivation.  It also is used in the production of aluminum chemicals, fire extinguisher compounds, soil additives and fertilizer, soaps, greases, drugs and cosmetics.  It even enters into the sports arena, as an additive to give major league baseball covers their hard, tough hides.
>
> In short, alum touches the lives of just about everyone in many ways.

19.   Alum is produced by mixing aluminum trihydrate with sulfuric acid in a reactor and

then crushing the material to make the desired grade.  It is produced as non-combustible white

crystals that are soluble in water.  As noted on GEO's website, "[a]lmost all the alum produced

in the United States today is manufactured from bauxite, bauxitic clays and other clays, which

are found primarily in Alabama, Arkansas, Georgia, and Missouri."

20.   As this description suggests and as was confirmed by the Water Research

Foundation in a 2009 report ("WERF Report"), "[a]lum is a commodity chemical."  The

American Water Works Association has promulgated a standard for "Aluminum Sulfate--Liquid,

Ground or Lump."  AWWA 8403-09.

21.   Dry alum and liquid alum that are produced domestically have been viewed by the

United States International Trade Commission as "like" products to dry alum imported from

579148.1

abroad, given the products' interchangeability, common uses, common channels of distribution, common manufacturing facilities and production employees, customer perceptions and price. *Aluminum Sulfate from Venezuela*, Inv. Nos. 701-TA-299, 7431-TA-431 (Final), USITC Pub. 2242 at 4-5 (December 1989); *Dry Aluminum Sulfate from Sweden*, Inv. No. 731-TA-430 (Preliminary), USITC Pub. 2174 at 10 (March 1989).

22.  An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers." These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements. For example, GCC's current website makes much of the fact that "all of our facilities are NSF certified, to the NSF/ANSI Standard 60: Drinking Water Treatment Chemicals --Health Effects."

23.  While the markets for some types of water treatment chemicals are somewhat fragmented, with a number of competing firms, that is far less true in the United States alum market. GenTek's Form 10-Ks submitted to the United States Securities & Exchange Commission ("SEC") issued in 2003-09 repeatedly identified GCC as the "largest North American producer" of alum. Its main competitor was identified as GEO.

24.  In October of 2000, Integrated Laboratory Systems prepared a toxicological summary for aluminum compounds for the National Institute of Environmental Health Sciences, which concluded that GCC, which then had 34 alum plants in the United States and Canada, controlled 45% of the market. GEO was identified as the second largest producer, with eleven plants concentrated in the Southeastern United States.

25.  GCC's market share at that point was achieved in part through acquisitions, such as its purchase of Peridot, an alum manufacturer based in Augusta, Georgia, in 1997.

26.  GCC's market share increased as time went on. As GenTek noted in its Form 10-K filed on March 13, 2009 for the 2008 fiscal year, GCC: (a) acquired Bay Chemical & Supply Company on December 31, 2007, which produces and distributes alum for the south Texas municipal water treatment market; (b) acquired the assets of Chalum, Inc. on February 6, 2007,

which produces alum for the Phoenix, Arizona water treatment market; and (c) acquired the assets of GAC MidAmerica, Inc. on September 21, 2006, which manufactured, *inter alia*, alum at manufacturing facilities in Ohio, Indiana, and Wisconsin.  By the time of the Chemtrade Acquisition, GCC owned 38 water treatment chemical plants.

27.  This pattern of increased concentration through acquisition was not atypical.  GEO's 2003 Form 10-K describes how it entered into, and expanded in, the North American alum market as follows:

> GEO was formed by George P. Ahearn and William P. Eckman to build, primarily through acquisitions, a specialty chemical business targeted in strategic markets. GEO's initial acquisition occurred on February 3, 1993 with the purchase of Rhone-Poulenc, Inc.'s Gulf Coast aluminum sulfate business, a manufacturer and supplier of paper processing chemicals and processed clays located in the Southeastern United States, for $3.6 million.  On July 15, 1994, GEO acquired the assets of Courtney Industries, Inc., a manufacturer of aluminum-based chemicals used in water treatment and industrial applications, for $5.1 million.  The acquisition of Courtney Industries also provided GEO with complementary products to its existing sulfate business.  On June 30, 1995, GEO purchased the customer list relating to the dry aluminum sulfate business of Rhone-Poulenc, Inc. for an aggregate $375,000.  GEO acquired seven plants comprising the business and assets of the aluminum sulfate business of Cytec Industries Inc. [("Cytec")] on December 5, 1996 for $7.3 million.  The acquisition of Cytec Industries further improved GEO's position in the aluminum sulfate market and expanded its network of strategically located plants in the Southeastern United States.
>
> On March 25, 1997, GEO purchased from Henkel Corporation (the relevant business of which has been spun-off as Cognis Corporation) two modern ISO 9002 certified manufacturing plants located in the United States and involved in the development, manufacture and supply of specialty paper chemicals and construction and process aluminum additive chemicals, for $54.2 million.  Through the Henkel acquisition, GEO became one of the most diversified specialty chemical suppliers to the paper industry with over 200 products.

28.   The Cytec acquisition is particularly important here.  As reported in ICIS, a leading industry trade publication, "[t]he Cytec acquisition was significant for GEO because it made the company a major national supplier of aluminum based coagulants and flocculants, as well as the second largest alum producer in the US behind General Chemical.  General Chemical has a 45 percent share of the market, and GEO holds 20 percent."  As noted above, this acquisition occurred in December of 1996, shortly before the commencement of the conspiracy alleged by DOJ.

29.   Thus, the recent history of the United States alum market has been one of continuous consolidation, with fewer and fewer major competitors.

30.   As of 2009, the WERF Report estimated that there were 50-60 alum manufacturing plants located in the United States. Collectively, as of the time of the Chemtrade Acquisition, GCC and GEO owned approximately 49 of them, giving the two companies a predominant share of the market.

31.   As Assistant Attorney General William Baer noted in press remarks on July 14, 2015 delivered in another context, "[i]n my experience looking at markets with just a few players, sometimes there is a temptation to coordinate behavior."

32.   As the foregoing reflects, GCC and GEO serve two primary markets: (1) governmental water treatment facilities that are either owned by governmental bodies or are owned by private entities that contract out their services to governmental entities and (2) pulp and paper manufacturers.

33.   The water treatment facilities typically acquire alum through a publicly-advertised competitive bidding process.  Contracts are typically one year in duration, although some contracts specify a renewal period. The results of this bidding process are typically made public.

34.   Pulp and paper manufacturers typically acquire alum through requests for proposals ("RFPs") sent to suppliers.  Any resulting contract may last for a year or more and its contents are typically not made public.

35.   In both situations, alum is sold by the ton and is transported to the customer by rail or truck.

36.   There is limited growth within these markets.  As Kemira Oyj, a Finnish producer of alum, noted in its 2014 Annual Report, "[o]nly modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."  This conclusion was nothing new.  ICIS noted in a September 17, 2004 report that "the alum market has not seen a significant jump in new growth this year, as the market continues to be balanced overall and very mature, with annual demand growth in the range of 2 to 3 percent. Additionally, the water treatment market has not seen any additional growth of note over the past year."

37.   ICIS reports also give a picture of the constant price increases for both dry and liquid alum that occurred during the Class Period.

38.   According to ICIS, prior to 1998, "the alum industry went through a period of stiff competition that triggered a downturn in its major markets."  That changed when a price increase of $7 per ton for liquid alum was announced by the market leaders in January of 1998.  Although not fully successful, the January 1998 price increase was followed in September 1998 by another price increase, this time $15 per ton for dry alum.  As noted at the time by Karla Doremus-Tranfield ("Doremus-Tranfield"), a marketing manager for GCC, this price increase was the first since 1991.  The purpose was apparently to bring the price of dry alum in line with that for liquid alum.

39.   In October of 1999, GCC announced another price increase for dry alum of $15 per ton.  Doremus-Tranfield noted that the 1998 price increase had been largely successful: "[f]or the most part, pricing shifted upward."  The 1999 price increase was imposed despite declining sales.  Doremus-Tranfield observed that "[t]he downturn in pulp and paper has led to reduced volumes for alum."  The price increase was effectuated even though usage of dry alum by water treatment authorities was also declining, because they preferred to use liquid alum.

10

40.   In November of 2000, GEO initiated a price increase of $8 per ton on alum, which other producers followed.  Denny Grandle, Vice-President and General Manager of GEO's aluminum products group, remarked that "[p]ricing is finally starting to gain ground, although it still has a ways to go to get back to where it was eight to 10 years ago."

41.   With this goal in mind, GCC and GEO, in October and again in November of 2003, announced successive $10 per ton increases on both dry and liquid alum.

42.   In September of 2004, GEO announced a price increase of $10 per ton for both dry and liquid alum despite the fact that there was virtually no growth in the water treatment sector and demand in the pulp and paper sector had contracted.  Increasing costs for raw materials were blamed for the increase.

43.   GCC followed suit with its own price increases in December of 2004.  These were also attributed to increases in the costs of raw materials.  Rich Fedison, Director of Sales and Marketing for GCPP, was quoted as saying that demand had stabilized and that "[a]ll announced price increases for aluminum-based inorganic coagulants are continuing to hold in all end-use markets."

44.   These wholesale price increases figured into the bid-rigging on which the DOJ has focused.

45.   The aforementioned WERF Report analyzed a survey about the rising costs of water treatment chemicals during the period between January 2008 and January 2009 that was administered by the Association of Metropolitan Water Agencies and to which 47 United States drinking water utilities responded.  Twenty-five of those entities reported using alum and, during the period of that single year, reported an average 53% price increase with maximum increases as high as 168%.  Again, raw material cost increases were cited as the major cause of these increases.  However, as noted by the WERF Report, the "boom" in commodities prices was over by mid-2008.

46.   As GenTek reported in the aforementioned 2009 Form 10-K for the year 2008, price increases on products such as alum contributed significantly to the profits earned by GenTek on

11

successful bids or responses to RFPs in the water treatment market: "[s]ales into the water treatment market increased by $67 million [$482 million in 2008, as opposed to $397 million in 2007] driven by $59 million resulting from increases in selling prices.…"

### THE DOJ INVESTIGATION INTO THE UNITED STATES ALUM MARKET

47. CLIF is a Canadian entity and does not file annual reports with the SEC.  However, it does make available "Annual Information Forms" ("AIFs").

48. On March 4, 2014, CLIF issued an AIF for the 2013 calendar year, the year it commenced the Chemtrade Acquisition.  In that form, it stated the following:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency "marker" from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition.  The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time.  Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations.  The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.

49. On March 5, 2015, CLIF issued an AIF for the 2014 calendar year.  It stated the following:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the

579148.1

General Chemical Acquisition. The investigation may result in separate civil litigation being initiated against Chemtrade. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.

50. The significance of CLIF obtaining conditional amnesty under the DOJ's corporate leniency program is explained on the DOJ's website (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

As indicated on the webpage, the leniency applicant must also establish "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

51. During most of the Class Period, Reichl held positions at GCC in which he was responsible for the sale and marketing of water treatment chemicals, including liquid aluminum

sulfate.  Reichl belonged to water chemical trade associations, including the Georgia Association of Water Professionals, where he had an opportunity to meet with his co-conspirators to discuss the subject matter of the conspiracy.

52.  Prior to July 2005, Reichl was General Manager of Water Chemicals for GCC. From approximately December 2006 until his employment with GCC terminated in 2010, Reichl was Vice-President of Sales and Marketing.  Both positions required Reichl to oversee the sale and marketing of water treatment chemicals, including liquid  aluminum sulfate.  Reichl was also responsible for pricing and strategy, including analyzing proposals and approving bids.

53.  As a result of the investigation precipitated by CLIF's application for amnesty, an information was filed against Reichl, who pleaded guilty to a violation of Section 1 of the Sherman Act.  The DOJ's press release announcing the plea indicated the widespread nature of its investigation and the likelihood of criminal prosecutions against others:

> A former executive of a water treatment chemicals manufacturer has pleaded guilty for his role in a conspiracy to eliminate competition by fixing prices, rigging bids and allocating customers for liquid aluminum sulfate supplied to municipalities and pulp and paper companies in the United States.
>
> Frank A. Reichl, of Flanders, New Jersey, admitted to agreeing not to compete for contracts for liquid aluminum sulfate, a coagulant used by municipalities to treat drinking and waste water, and by pulp and paper companies in their manufacturing processes.
>
> "By agreeing not to disturb each other's 'historical' business, Reichl and his co-conspirators cheated municipalities and paper companies out of competitive prices for their supplies of liquid aluminum sulfate, a key water treatment chemical," said Assistant Attorney General Bill Baer of the Justice Department's Antitrust Division.  "We continue to work with our partners at the FBI to hold offenders in this industry criminally accountable."
>
> According to documents filed with the court, from 1997 until July 2010, Reichl and his co-conspirators met to discuss each other's liquid aluminum sulfate business, submitted intentionally losing bids to favor the intended winner of the business, withdrew inadvertently winning bids and discussed prices to be quoted or

bid to customers.  Reichl is the first defendant to plead guilty to participating in this decade-and-a-half-long conspiracy.

"Reichl and his co-conspirators colluded to circumvent competitive bidding and independent pricing for liquid aluminum sulfate contracts, and conspired to raise prices by submitting artificially inflated bids to their customers," said Special Agent in Charge Richard M. Frankel of the FBI's Newark Division.  "They also allocated customers in furtherance of their collusive scheme. By agreeing to violate both the spirit and the letter of the competitive process, Reichl and others defrauded municipalities as well as pulp and paper companies out of millions of dollars."

54.  Reichl was accused of (and pleaded guilty to) a conspiracy to eliminate competition in the sale and marketing of liquid alum by "agreeing to rig bids and allocate customers for, and to fix, stabilize and maintain the price of liquid aluminum sulfate sold to municipalities and pulp and paper companies in the United States" in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). *Reichl* Dkt. No. 1 at ¶11.

55.  In furtherance of this conspiracy, Reichl was accused of (and pleaded guilty to) the following acts:

    a.  participating in meetings and conversations in the District of New Jersey and elsewhere to discuss each other's liquid aluminum sulfate business;

    b.  agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

    c.  tracking bid and pricing histories to determine which accounts were the 'historical' customers of each co-conspirator or other supplier of liquid aluminum sulfate, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

    d.  submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" liquid aluminum sulfate customers;

    e.  from time to time, in the District of New Jersey and elsewhere, discussing the price to be quoted to a customer

by the intended winner to determine the amount of the
intended loser's intentionally losing or "throw away" bid
or price quotation;

f.  from time to time, upon request of a co-conspirator,
withdrawing inadvertently winning bids submitted to co-
conspirators' "historical" customers;

g.  where a co-conspirator could not withdraw its
inadvertently winning bid, bidding to lose on one of its
own customers to compensate for the loss of that
"historical" customer; and

h.  instructing new employees as to how to determine whether
and how to bid on or quote a price for the business of
liquid aluminum sulfate customers so as to comport with
the agreement not to compete between the defendant and
co-conspirators.

*Reichl* Dkt. No. 1 at ¶13.

56.  The DOJ has stated "[t]here are potentially hundreds of municipalities and pulp and

paper companies that were affected over the thirteen-year course of the conspiracy…." *Reichl*

Dkt. No. 8 at 2.

57.  While GEO is not mentioned by name in the information, given the facts that (a) it

became the second-largest producer and marketer in the United States alum market in late 1996,

shortly before the alleged conspiracy commenced; (b) a bid-rigging conspiracy would likely have

included GEO, given its status as the second-largest alum producer, and given that it often bid

head-to-head against GCC for municipal water district contracts; (c) the proximity of GEO's

corporate offices to those of GCC's, as well as the proximity of the two companies' water

treatment manufacturing facilities along the Eastern seaboard (GEO has facilities in North and

South Carolina, Maryland and Georgia, while GCC has facilities in Pennsylvania, Georgia,

South Carolina and Virginia and invoices at least some alum shipments out of North Carolina);

(d) GEO's history of instituting alum price increases in conjunction with GCC (including price

increases that represented a sharp departure from prior alum pricing practices); (e) GEO's actual

bidding practices during the Class Period; and (f) the DOJ's reference to other "offenders in this

industry" who would be held "accountable," it is alleged, on information and belief, that representatives of GEO were among Reichl's co-conspirators.

## CLASS ACTION ALLEGATIONS

58.   Plaintiff brings this action on behalf of itself and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased aluminum sulfate within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 1997 and July 31, 2010. Excluded from the class are Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

59.   Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, Plaintiff believes that Class members number at least in the hundreds (as DOJ has indicated) and are sufficiently numerous and geographically dispersed so that joinder of all Class members is impracticable.  According to a 2009 report by Water Market USA, there were, at that time, approximately 1232 governmental water utilities or water treatment districts in the United States.

60.   There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

   a.   Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for alum;

   b.   Whether Defendants rigged bids and allocated customers and markets for alum;

   c.   Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for alum;

    d.   The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for alum;

    e.   Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

    f.   Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

    g.   Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

    h.   Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

61.   Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and the members of the Class have all sustained damage in that, during the Class Period, they purchased alum directly from one or more Defendants at artificially maintained, supra-competitive prices, established by Defendants' actions in connection with the anticompetitive behavior alleged herein.  Defendants' anticompetitive conduct, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

62.   Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

63.   Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

64.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

65.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

579148.1

    a.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

    b.   The Class is readily definable and one for which records should exist in the files of Defendants.

    c.   Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

    e.   Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

66.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

67.   Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief.

68.   Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at or about October of 2015, when Reichl was prosecuted.  The AIFs prepared by CLIF did not put Plaintiff on notice that the DOJ investigation was focused on alum.

69.   Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for alum.

70.   The municipal water district bid requests often contained anti-collusion statements to which each bidder had to subscribe.  Defendants falsely swore that they were complying with those clauses, thereby affirmatively concealing from the entities requesting such bids that collusion was occurring.

71.  Likewise, in responding to RFPs sent out by paper and pulp manufacturers, Defendants did not disclose that they were collusively rigging bids.

72.  In announcing price increases for alum, Defendants often asserted that the cause of such increases was attributable entirely to higher raw material and energy costs, without disclosing their conspiracy to fix and maintain alum prices.

73.   Accordingly, Plaintiff could not have had either actual or constructive knowledge of the price fixing scheme until the public disclosure of the DOJ's criminal investigation.

74.  Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for alum during the Class Period.

### COUNT I

**Violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)**

75.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

76.  Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of alum within the United States, its territories, and the District of Columbia  in violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

77.  Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and supracompetitive levels, the prices of alum.

78.  In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to (a) artificially fix, raise, maintain and/or stabilize the price of alum; (b) rig bids for alum; and (c) allocate customers and territories with respect to the marketing of alum.

20

79.   The illegal combination and conspiracy alleged herein had the following effects, among others:

    a.   The prices charged by Defendants to, and paid by, Plaintiff and members of the Class for alum were fixed, raised, maintained and/or stabilized at artificially high and supracompetitive levels;

    b.   Plaintiff and members of the Class have been deprived of free and open competition in the purchase of alum;

    c.   Plaintiff and members of the Class have been required to pay more for alum than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

    d.   Competition in the sale of alum has been restrained, suppressed or eliminated.

80.   As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

C.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class;

D.      That the Court award Plaintiff and the Class treble damages;

E.      That the Court award Plaintiff and the Class attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

F.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their co-conspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.      That the Court award Plaintiff and the Class such other and further relief as may be deemed necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a jury trial on all matters so triable.

Dated: January 19, 2016

Respectfully submitted,

*s/Bruce D. Greenberg*
Bruce D. Greenberg
Joseph J. DePalma
**LITE DEPALMA GREENBERG**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Fax: (973) 623-0858
bgreenberg@litedepalma.com
jdepalma@litedepalma.com

Steven J. Greenfogel
Mindee J. Rueben
**LITE DEPALMA GREENBERG, LLC**
1835 Market Street - Suite 2700
Philadelphia, NJ 19103
Tel: (267) 519-8306
sgreenfogel@litedepalma.com
mreuben@litedepalma.com

579148.1

Arthur N. Bailey, Esq.
Marco Cercone, Esq.
Robert C. Singer, Esq.
Rupp Baase Pfalzgraf Cunningham, LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
bailey@ruppbaase.com
cercone@ruppbaase.com
singer@ruppbaase.com

***Counsel for Ottawa County, Ohio***

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that to the best of my knowledge, the matter in controversy is the subject of other actions pending in this court: *United States of America v. Frank A. Reichl*, Criminal. No. 15-cr-554 (D.N.J.); *Central Arkansas Water v. Chemtrade Logistics, Inc., et al* Case No. 2:15-cv-7827 (SRC-CLW); *Detroit Water and Sewerage Department v. General Chemical Corporation*, et al Case No. 2:15-cv-7896 D. N.J. (JJL-JAD); *Chester Water Authority v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-7928 D. N.J. (JLL-JAD); *City and County of Denver v. General Chemical Performance Products, LLC, et al* Case No. 2:15-cv-7996 D. N.J. (SRC-CLW); *City of Winter Park v. Chemtrade Chemicals Corporation*, et al Case No. 2:15-cv-8031 D. N.J. (SRC-CLW); *Hazelton City Authority v. Chemtrade Chemicals Corporation*, et al Case No. 2:15-cv-8056 D. N.J. (SRC-CLW); *The City of Cincinnati v. General Chemical Corporation; et al* Case No. 2:15-cv-8065 D. N.J. (SRC-CLW); *American Eagle Paper Mills, Inc. v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8142 D. N.J. (SRC-CLW); *Oakland County, Michigan v. Chemtrade Chemicals Corporation, et al* Case No, 2:15-cv-8198 D. N.J. (SRC-CLW); *City of Greensboro v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8230 D. N.J. (SRC-CLW); *City of Newark v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8261 D. N.J. (SRC-CLW); *Amrex Chemical Company, Inc. v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8227 D. N.J. (SRC-CLW); *Brick Township Municipal Utilities Authority v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8273 D. N.J. (SRC-CLW); *City of Texarkana, Arkansas v. Chemtrade Chemicals Corporation, et al* Case No. 2:15-cv-8294 D. N.J.(SRC-CLW); *City of Columbia, South Carolina v. Frank A. Reichl, et al* Case No. 2:15-cv-8429 (SRC-CLW); *Suez Water Management & Services Inc. et al v. Reichl, et al* Case No. 2:15-cv-8697 (SRC-CLW);  *Town of Tonawanda, New York v. Reichl et*

*al* Case No. 2:15-cv-8739 (SRC-CLW); *The City of Charlotte v. Reichl, et al* Case No. 2:15-cv-8755 (SRC-CLW); *Beaver Water District v. Reichl, et al* Case No. 2:15-cv-8887 (SRC-CLW); *City of Siloam Springs, Arkansas v. Reichl et al* Case No. 2:15-cv-8888 (SRC-CLW); *City of Springdale, Arkansas v. Reichl et al* Case No. 2:15-cv-8889 (SRC-CLW); *Interstate Chemical, Inc. v. Reichl, et al* Case No. 2:16-0009 (SRC)(CLW).

I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 19, 2016        By:      /s/ *Bruce D. Greenberg*
                                       Bruce D. Greenberg
                                       Joseph J. DePalma
                                       **LITE DEPALMA GREENBERG**
                                       570 Broad Street, Suite 1201
                                       Newark, NJ 07102
                                       Tel: (973) 623-3000
                                       Fax: (973) 623-0858
                                       bgreenberg@litedepalma.com
                                       jdepalma@litedepalma.com

                                       *Counsel for Ottawa County, Ohio*